COURT OF APPEALS DIV I
2014 JUL 14 AM 11: 13



# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 69005-1-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | |
| | ) | |
| LUIS ANDRE PEREZ, | ) | UNPUBLISHED |
| | ) | |
| Appellant. | ) | FILED: July 14, 2014 |
| | ) | |

Cox, J. — Luis Andre Perez appeals his judgment and sentence for one count of assault in the second degree, two counts of rape in the second degree, and one count of unlawful imprisonment. His custodial statements to police were not involuntary and were admissible. The trial court properly exercised its discretion in denying his mistrial motion following a trial irregularity. Likewise, it properly denied his motion for a new trial following conviction. The evidentiary rulings of the trial court do not warrant reversal. There was no cumulative error. The charging document was constitutionally sufficient. And the State properly concedes that the community custody term for count I, second degree assault, is not authorized.

In his statement of additional grounds, Perez claims errors based on jury instructions, prosecutorial misconduct, ineffective assistance of counsel, and sufficiency of the evidence. None warrant relief.

We affirm except for the community custody term, which we vacate. We remand for the trial court to amend or resentence on the community custody term for count I, second degree assault.

The events giving rise to the charges against Perez arose in January 2010.

During this time, Perez lived in a house with Troy O'Dell, Candice Sanders, and O'Dell and Sanders' two children. Christapher White, O'Dell's cousin, and E.C., a woman who had known O'Dell for approximately 15 years, also temporarily lived at the house.

At trial, E.C. testified that in the two to three days prior to the incident, she had been arguing with Sanders and was "fed up" with babysitting. She left the house "to get a break." During this time she used crack cocaine and did not sleep. When she returned to the house, another dispute arose between Sanders and her. It turned physical when Sanders punched her in the face. E.C. said that she tried to leave but Sanders, O'Dell, White, and Perez pulled her back into the house. E.C. and Sanders continued to fight.

White and Perez got involved and both punched E.C. in the face. She sustained substantial physical injuries during the course of this assault. She bled heavily, soaking her clothing and her blood pooled on the floor where the assault occurred. She was not able to stand up, and she was dizzy. E.C. testified that O'Dell threatened her, and she felt scared.

Following this assault, White and Perez took her downstairs to clean her up. She needed their assistance to walk because she was very unsteady.

Once downstairs, they had E.C. disrobe without allowing her to do so privately. They then threatened to kill her, saying they would not do so if she allowed them to have sex with her. Despite her protests, they both raped her for about 15 to 20 minutes.

After White and Perez raped E.C., the evidence showed that the men would not let her leave. This restraint went on for a period of a day or so. She finally escaped.

E.C. ran to a nearby house, and the neighbors gave her a ride to the hospital. She was in pain. E.C. told the treating nurse that she was afraid she would get hurt if she gave a lot of information. She told the attending emergency room physician that she had been attacked, raped, and held hostage. E.C. was reluctant to allow the physician to examine her, and she told him that she was concerned that people who did this to her "would show up at the hospital and execute her with handguns."

E.C. had "fairly significant bruising" around her left eye, along her left jaw and her right chin, and she had a cut above her left eye. Her CT scan revealed a blowout fracture of the orbital bone on the left side of her face. She also had scratches and bruising on her back and on her shin.

E.C. was transferred to Harborview Medical Center for further evaluation and for a sexual assault exam. A sexual assault nurse examiner performed an exam. E.C. told the nurse that she had been anally raped.

E.C. told a Harborview social worker that she was afraid that her assailants would try to kill her for reporting the crime. She was reluctant to make

3

a police report, but she finally did so. A police officer took a recorded statement from E.C.

Based on E.C.'s report to authorities, police arrested Perez, White, O'Dell and Sanders. Police questioned Perez on three occasions during the early morning hours of January 23, 2010. After the first interview, police collected Perez's clothing. While doing so, they found a bag of pills in his underwear. Perez's second interview consisted of a polygraph exam. During his third interview, Perez admitted to having anal sex with E.C. He claimed the sex was consensual.

The State charged Perez and White, by amended information, with one count of assault in the second degree, and two counts of rape in the first degree. In the alternative, the State charged two counts of rape in the second degree, and one count of unlawful imprisonment.

Perez moved to suppress the transcripts of the recorded statements made during his interrogations, arguing that the statements were made involuntarily. After a hearing, the trial court denied the motion. It entered written findings of fact and conclusions of law in support of the denial. The court determined that Perez's statements were not involuntary and were admissible.

This case went to trial against both White and Perez in late 2011. O'Dell and Sanders entered into plea agreements. They testified for the State at the trial. Perez testified on his own behalf, denying all charges.

The jury found both defendants guilty of assault in the second degree, two counts of rape in the second degree, and unlawful imprisonment. Following the verdict, Perez moved for a new trial, which the court denied.

Perez appeals.

## MOTION TO SUPPRESS

Perez argues that the trial court erred when it determined that his custodial statements to the police were voluntary and admissible. Specifically, he contends that his statements were involuntary because they were induced by a police sergeant's false promise of leniency. We disagree under the totality of the circumstances in this case.

"'[T]he determination whether statements obtained during custodial interrogation are admissible against the accused is to be made upon an inquiry into the totality of the circumstances surrounding the interrogation, to ascertain whether the accused in fact knowingly and voluntarily decided to forgo his rights to remain silent and to have the assistance of counsel.'"[1] "[B]oth the conduct of law enforcement officers in exerting pressure on the defendant to confess and the defendant's ability to resist the pressure are important."[2]

Circumstances that are potentially relevant in the totality of the circumstances analysis include the "'crucial element of police coercion'; the length of the interrogation; its location; its continuity; the defendant's maturity, education, physical condition, and mental health; and whether the police advised

---

[1] State v. Unga, 165 Wn.2d 95, 100, 196 P.3d 645 (2008) (quoting Fare v. Michael C., 442 U.S. 707, 724-25, 99 S. Ct. 2560, 61 L. Ed. 2d 197 (1979)).

[2] Id. at 101.

5

the defendant of the rights to remain silent and to have counsel present during custodial interrogation."[3]

"In assessing the totality of the circumstances, a court must consider any promises or misrepresentations made by the interrogating officers."[4] "A promise made by law enforcement does not render a confession involuntary per se, but is instead one factor to be considered in deciding whether a confession was voluntary."[5] "The court must determine whether there is a causal relationship between the promise and the confession."[6] "The inquiry is whether the Defendant's will was overborne."[7]

"A police officer's psychological ploys, such as playing on the suspect's sympathies, saying that honesty is the best policy for a person hoping for leniency, or telling the suspect that he could help himself by cooperating may play a part in a suspect's decision to confess, 'but so long as that decision is a product of the suspect's own balancing of competing considerations, the confession is voluntary.'"[8] "'The question [is] whether [the interrogating officer's]

---

[3] Id. (quoting Withrow v. Williams, 507 U.S. 680, 693-94, 113 S. Ct. 1745, 123 L. Ed. 2d 407 (1993)).

[4] State v. Broadaway, 133 Wn.2d 118, 132, 942 P.2d 363 (1997).

[5] Unga, 165 Wn.2d at 101.

[6] Broadaway, 133 Wn.2d at 132.

[7] Id.

[8] Unga, 165 Wn.2d at 102 (quoting Miller v. Fenton, 796 F.2d 598, 605 (3d Cir. 1986)).

statements were so manipulative or coercive that they deprived [the suspect] of his ability to make an unconstrained, autonomous decision to confess.'"[9]

Findings of fact entered following a CrR 3.5 hearing are verities on appeal if unchallenged, and, if challenged, they are verities if supported by substantial evidence in the record.[10] A trial court's determination that a defendant's statements were made voluntarily will not be disturbed on appeal if there is substantial evidence in the record to support the court's decision.[11]

In State v. Unga, the supreme court considered Leaa'Esola Unga's claim that his confession was involuntary because it was coerced by a detective's promise.[12] First, the supreme court noted that there was no "offer of immunity."[13] That was because a police officer lacks authority to grant immunity from prosecution, rather, a prosecutor has such authority.[14]

The supreme court then considered whether Unga "reasonably perceived that an offer of immunity had been made and, if so, whether his confession was therefore involuntary."[15] It applied a totality of the circumstances analysis.[16] In doing so, it identified several considerations. It noted that Unga was given

---

[9] Id. (alterations in original) (quoting Miller, 796 F.2d at 605).

[10] Broadaway, 133 Wn.2d at 131.

[11] Id. at 133; State v. Hepton, 113 Wn. App. 673, 685, 54 P.3d 233 (2002).

[12] 165 Wn.2d 95, 97, 196 P.3d 645 (2008).

[13] Id. at 104.

[14] Id.

[15] Id. at 104-05.

[16] Id. at 105-12.

<u>Miranda</u> warnings, knew what his rights were, waived his rights, did not lack capacity, was old enough to make a statement intelligently and voluntarily, and had completed the ninth grade.[17] It also noted that Unga was aware he was being questioned, the questioning was short in duration, he was in a room with the door left open, he was not subjected to lengthy or repeated rounds of questioning, there was no evidence that the detective used a threatening tone, threatened, or intimidated Unga.[18] Additionally, there was no evidence that Unga was deprived of any necessities such as food, sleep, or bathroom facilities.[19] The court then concluded, "Under all of these circumstances, we do not agree that [the detective's] promise was coercive conduct that overbore Unga's will and caused him to confess."[20]

Here, Perez was interviewed on January 23, 2010 on three occasions: at approximately 12:10 a.m., 3:05 a.m. and 4:30 a.m. Perez was in custody for all of the questioning. He was advised of his <u>Miranda</u> warnings before all three interviews. Perez signed written waivers with respect to these rights for the first two interviews but not the third. Perez's first interview lasted approximately 35 minutes. Perez's second interview, a polygraph examination, lasted approximately one hour and twenty minutes. During Perez's third interview, he admitted to having anal sex with E.C. He claimed that the sex was consensual.

---

[17] <u>Id.</u> at 108-09.

[18] <u>Id.</u> at 109.

[19] <u>Id.</u>

[20] <u>Id.</u> at 111.

Perez argues that his statement was induced by a false promise of leniency. The promise allegedly occurred after the first interview, as Sergeant John Hall took Perez to a holding cell.

As in Unga, there is no claim that a prosecutor offered Perez immunity from prosecution. Rather, the claim is that a police officer did so. Police officers lack authority to grant immunity from prosecution. Only a prosecutor has such authority, as the Unga court observed.

On appeal, Perez disputes the trial court's characterization of the alleged promise. The trial court's finding stated:

> Shortly after the defendant's first interview with Det. Knudson, King County Sheriff's Office Sgt. Hall discussed the oxycodone pills that the defendant had secreted in his undershorts. The defendant testified that Sgt. Hall promised him leniency *in his likely drug case* if the defendant would talk to detectives about the rape allegations. The defendant testified he understood this to be a quid-pro-quo: if he talked about sex with E.C. *he would receive leniency for possession of illegal narcotics*.[21]

Specifically, Perez argues that Sgt. Hall promised him leniency on the *rape charge*, not the drug charge. We need not resolve whether the trial court's characterization of this alleged promise is correct.

As the trial court determined, *even if* it took Perez's testimony at face value, it was insufficient to amount to a promise or threat that would cause Perez to involuntarily waive his right to remain silent:

> A. Sgt. Hall's brief encounter with the defendant, even if taken at face value as described by the defendant, is insufficient to amount to a promise or threat which would cause the defendant to

---

[21] Clerk's Papers at 246 (emphasis added).

9

involuntarily waive his right to remain silent. ***The statement, as described by the defendant, was not coercive.***[22]

Looking to the totality of the circumstances, there is substantial evidence to support the trial court's determination of voluntariness.

In an unchallenged finding the trial court stated, "Mr. Brunson and Det. Knudsen confronted the defendant with the fact that he had failed the polygraph. Mr. Brunson told the defendant that his machine "did not lie." After being confronted with the polygraph results, Mr. Perez admitted to having anal sex with E.C."[23] This finding shows that Perez's statement was not induced by the alleged promise. The alleged promise occurred after the first interview and before Perez's polygraph examination. During the polygraph, Perez maintained that he did not have sex with E.C. As the trial court found, it was after being confronted with his failed polygraph results that Perez admitted to having sex with E.C. This finding supports the trial court's determination of voluntariness because it shows there is not a causal relationship between the alleged promise and the confession.

Further, other circumstances also support the trial court's determination of voluntariness. The following unchallenged findings are verities on appeal.

In one finding the trial court stated, "During his stay with police, the defendant had access to restroom facilities. Police also offered the defendant food and water."[24]

---

[22] Id. at 247 (emphasis added).

[23] Id. at 246.

[24] Id.

In another finding the court stated:

> B. The defendant's testimony at the CrR 3.5 hearing was generally not credible. In particular, the audio and visual recordings of the defendant's testimony reveal that the defendant appeared and sounded alert and coherent despite his trial testimony to the contrary. The defendant testified at trial that he did not understand that he could have a lawyer present during the polygraph examination. However, the defendant signed two waivers, including one immediately prior to the polygraph, in which he was advised he could have an attorney present. The defendant further testified he was not allowed to have anything to eat or drink during the time he was held. This statement was refuted by the testimony of multiple officers, including Det. Knudsen, who went so far as to offer the defendant a meal from a fast food restaurant. Finally, the defendant's assertion that bathroom facilities were unavailable to him is directly contradicted by the presence of a toilet in the holding cell at the Burien precinct.[25]

Both of these findings show that Perez was offered food and had access to restroom facilities. The second finding establishes that Perez was generally not credible. Additionally, it shows that he was alert and coherent, understood his rights, and signed two waivers. Like in Unga, these factors support the voluntariness of Perez's confession.

Further, in other unchallenged findings, the court found that Perez was advised of his Miranda rights three separate times and signed a waiver with respect to his rights two times. In its oral ruling, the court noted that all waivers were knowing, voluntary, and intelligent. The record also shows that Perez knew that he was being questioned in relation to a criminal investigation. These were also factors considered persuasive in Unga.

In sum, there is substantial evidence to support the trial court's determination of voluntariness under the totality of the circumstances.

---

[25] Id. at 247-48.

Perez makes several arguments that his statements were involuntary. None are persuasive.

First, Perez argues that trial court found that Sgt. Hall promised Perez leniency and that this is a verity on appeal. But the trial court never made such a finding. Rather, the trial court found that "[Perez] *testified* that Sgt. Hall promised him leniency . . . ."[26] The trial court was not making its own determination about this alleged promise.

Perez also argues that the court "took [his] testimony at face value" and "[t]hus, the record supports the conclusion that there is a direct causal connection between Sergeant Hall's false promise of leniency and Mr. Perez's custodial statement." But the record does not support this assertion. Rather, the trial court expressly found that Perez was generally "not credible." Further, it stated *"even if"* it took Perez's testimony at face value, it was insufficient to amount to a promise or threat to overcome voluntariness. This finding does not conclusively establish a causal connection.

Second, Perez argues that under the totality of the circumstances, his statement was not voluntary for a variety of reasons. He asserts: (1) he was interrogated three times over an eight hour period into the early morning hours, (2) he was interrogated in full custody, (3) he did not eat during that period, (4) he had only slept for four hours, (5) police asked him over and over whether he had sex with E.C., and (6) his "weakened physical condition" and "lack of experience and education" made him vulnerable to coercion.

---

[26] Id. at 246 (emphasis added).

12

It is true that the questioning in this case was longer than in Unga, which was only thirty minutes.[27] But the record also shows that the questioning was not continuous, that each interview was not that long in duration, and that there were breaks in between the sessions.

Further, Perez's eighth grade education does not establish that his confession was involuntary. Although Perez testified that the last grade in school he completed was eighth grade, the record also shows that Perez was 22 at the time of the interrogation. In Unga, the court concluded that Unga's confession was voluntary even though he was only 16 1/2 years old and had only completed the ninth grade.[28] In support of this conclusion, the court cited cases holding that minors and defendants as young as 14 have been found to voluntarily confess.[29] In any event, the court found that Perez understood his rights and that all waivers were knowing, voluntary, and intelligent.

Moreover, some factors identified by Perez were explicitly rejected by the trial court in its findings. For example, Perez argues that he did not eat, was exhausted, and was in a weakened physical condition. But the trial court expressly found that Perez was alert, coherent, and was offered food. These findings are unchallenged verities on appeal

---

[27] See Unga, 165 Wn.2d at 109.

[28] Id. at 108-09.

[29] Id. (citing Gachot v. Stalder, 298 F.3d 414 (5th Cir. 2002); Simmons v. Bowersox, 235 F.3d 1124 (8th Cir. 2001); Gilbert v. Merchant, 488 F.3d 780 (7th Cir. 2007); Hardaway v. Young, 302 F.3d 757, 762-68 (7th Cir. 2002); Winfrey v. Wyrick, 836 F.2d 406, 410 (8th Cir. 1987)).

Third, Perez argues that the nature of the promise is directly relevant to its coercive effect. This is true and was acknowledged by the supreme court in Unga, when it stated, "An unqualified promise not to prosecute that in fact induces a confession may be 'of such a nature that it can easily be found to have overcome a person's resistance to giving a statement to authorities.'"[30]

But in Unga, the court did not set forth a blanket rule that *all* promises of leniency lead to a determination that the statement is involuntary. Rather, the court expressly concluded, "The fact that a promise has been made not to charge a defendant . . . does not alone render a subsequent confession involuntary."[31] And the Unga court, after evaluating all of the circumstances, determined that the confession was nonetheless voluntary.[32] For the reasons discussed previously, the same is true here.

Fourth, Perez relies on extra jurisdictional cases to argue that "in cases where police officers made promises that misrepresented the law, courts applying the totality of the circumstances test have held defendants' resulting confessions involuntary."[33] But again, a promise made by law enforcement "does

---

[30] Id. at 108 (quoting United States v. Conley, 859 F. Supp. 830, 836 (W.D. Pa. 1994)).

[31] Id. at 113.

[32] Id.

[33] Appellant's Opening Brief (Amended) at 25-26 (citing United States v. Lall, 607 F.3d 1277, 1281-82 (11th Cir. 2010); Hopkins v. Cockrell, 325 F.3d 579, 584-85 (5th Cir. 2003); Henry v. Kernan, 197 F.3d 1021, 1027-28 (9th Cir. 1999); United States v. Baldwin, 60 F.3d 363 (7th Cir. 1995), United States v. Walton, 10 F.3d 1024, 1030-32 (3d Cir. 1993); United States v. Rogers, 906 F.2d 189, 191-92 (5th Cir. 1990); Samuel v. State, 898 So. 2d 233, 237 (Fla. Dist. Ct. App. 2005); State v. Rezk, 150 N.H. 483, 485, 840 A.2d 758 (2004)).

not render a confession involuntary per se . . . ."[34] Nor does such a promise give rise to that presumption.[35] Perez's reliance on these cases as setting forth a general rule is not persuasive. The promise here was similar to that in Unga, which guides our analysis.

Finally, Perez attempts to distinguish Unga on the basis that in that case the State made no false promise of leniency because it "kept its side of the bargain" and did not charge Unga with graffiti. But Perez does not explain why it matters whether he was offered a "false" promise of leniency or a promise of leniency. And it is not clear why this distinction would make a difference when examining his ability to make a rational decision at the time of the confession. Further, in Unga, the court stated that "[t]he mere fact that an unfulfilled promise was made in exchange for a person's statement does not constitute coercion, rendering the statement involuntary.' Such a promise, like any other promise of leniency, is only one factor in the totality of the circumstances analysis . . . ."[36] For these reasons, Perez's argument is not persuasive.

## SEVERANCE, MISTRIAL, AND NEW TRIAL MOTIONS

Perez argues that the trial court abused its discretion when it denied his severance and mistrial motions.[37] He makes the same argument with respect to

---

[34] Unga, 165 Wn.2d at 101.

[35] Id. at 112.

[36] Id. at 105 (alteration in original) (citation omitted) (quoting United States v. Flemmi, 225 F.3d 78, 91-92 (1st Cir. 2000)).

[37] The record reflects that both the court and the parties used these different terms to refer to the same motion. See Report of Proceedings (Dec. 12, 2011) at 1873.

his post-trial motion for a new trial. The basis for these motions was an alleged

trial irregularity during the testimony of E.C. Specifically, Perez argues that his

codefendant, White, nodded his head when E.C. testified that "snitches end up in

ditches." Perez argues that this "threatening gesture directed toward [E.C.]

during her testimony unfairly prejudiced Mr. Perez." We reject this argument.

Denial of a motion for a mistrial is reviewed under an abuse of discretion

standard.[38] An abuse of discretion occurs if the court's decision is manifestly

unreasonable or rests on untenable grounds.[39] "'The trial court should grant a

mistrial only when the defendant has been so prejudiced that nothing short of a

new trial can insure that the defendant will be tried fairly. Only errors affecting

the outcome of the trial will be deemed prejudicial.'"[40] Appellate courts determine

whether a mistrial should have been granted by considering (1) the seriousness

of the trial irregularity, (2) whether the trial irregularity involved cumulative

evidence, and (3) whether the trial court properly instructed the jury to disregard

it.[41]

Similarly, "a new trial is necessitated only when the defendant 'has been

so prejudiced that nothing short of a new trial can insure that the defendant will

---

[38] State v. Johnson, 124 Wn.2d 57, 76, 873 P.2d 514 (1994).

[39] State v. Griffin, 173 Wn.2d 467, 473, 268 P.3d 924 (2012).

[40] Johnson, 124 Wn.2d at 76 (quoting State v. Hopson, 113 Wn.2d 273, 284, 778 P.2d 1014 (1989)).

[41] Id.

be treated fairly.'"[42] An appellate court reviews a trial court's decision on a motion for a new trial for abuse of discretion.

Here, the trial court did not abuse its discretion when it denied these motions. In its written order denying Perez's post-trial motion for a new trial, the court analyzed these three factors for determining the effect of the trial irregularity.

For the first factor—seriousness—the court noted that White's conduct was not serious enough to warrant a mistrial. It also noted that it was unclear whether any of the jurors observed White's gesture, that it was unclear whether the defendants assaulted E.C. because she was a "snitch," that it was unclear whether White was "sending a message to E.C." or "merely agreeing with her that snitching is very risky business," that Perez confirmed that "snitches end up in ditches" in his own testimony, and that the prosecutor did not link White's in-court conduct to Perez.

For the second factor—cumulative evidence—the court noted that "there was significant evidence presented at trial that Mr. White and Mr. Perez both assaulted and raped [E.C.]." The court also pointed out that O'Dell and Sanders corroborated these facts, and there was significant evidence that E.C.'s fear for her life was reasonable. Additionally, it noted that all of the fact witnesses who testified, including Perez, "admitted that 'snitching' is considered morally reprehensible" and that "violent retribution can occur." Thus, the trial court

---

[42] State v. Bourgeois, 133 Wn.2d 389, 406, 945 P.2d 1120 (1997) (quoting State v. Russell, 125 Wn.2d 24, 85, 882 P.2d 747 (1994)).

concluded that White's in-court conduct was "merely cumulative of this evidence."

For the third factor—whether the trial court instructed the jury to disregard the irregularity—the court acknowledged that it did not instruct the jury that it could not infer guilt of Perez from White's behavior, because Perez's attorney had not provided a limiting instruction. But the court also stated that this was reasonable trial strategy and pointed out that White's attorney "defused the impact" of White's behavior by stating during closing that the behavior was "inappropriate" and that the trial had been "tedious and challenging" for White.

After looking to these three factors, and also noting that "Perez's decision to take the stand and testify did far more damage to his own case than did Mr. White's conduct," the trial court concluded that "there was no irregularity in the trial that prevented Mr. Perez from having a fair trial."

The trial court carefully evaluated these factors and also considered the effect of this irregularity in light of Perez's testimony. For the same reasons identified by the trial court in its written order, we conclude that the court did not abuse its discretion when it denied Perez's mistrial motion and his post-trial motion for a new trial.

Perez makes several arguments that White's conduct requires a new trial. None are persuasive.

First, Perez relies on State v. Taylor for the proposition that "when two defendants are tried together, evidence admitted against one of them is

prejudicial to the other."[43] But in Taylor, that analysis was utilized by the trial court to justify its conclusion that both defendants were entitled to a new trial.[44] The court concluded that "if [Taylor] did not have a fair trial, the same thing must be said as to the [other] defendant."[45] Here, in contrast, the trial court did not conclude that there was prejudice to either defendant, which by this logic, would also warrant a new trial for the other. Accordingly, Taylor is not helpful.

Next, Perez looks to State v. Beebe to argue that evidence of acts committed by a codefendant before or after the crime is inadmissible to prove the guilt of the other.[46] Perez argues that White's threatening gesture, made after the crime, was irrelevant to Perez's guilt and would have been inadmissible if he had been tried alone.[47] But even if this is true, and we were to construe this as an evidentiary error, any error would be harmless. There was no prejudice, because as the trial court noted, there was "significant evidence" presented at trial that Perez assaulted and raped E.C., including Perez's own admissions, corroborating testimony from E.C., O'Dell, and Sanders, and physical evidence of Perez's swollen hand.

---

[43] Appellant's Opening Brief (Amended) at 32 (citing State v. Taylor, 60 Wn.2d 32, 42, 371 P.2d 617 (1962)).

[44] See Taylor, 60 Wn.2d at 42.

[45] Id.

[46] Appellant's Opening Brief (Amended) at 33-34 (citing State v. Beebe, 66 Wash. 463, 468, 120 P. 122 (1912)).

[47] Id. at 34.

Perez also relies on Braswell v. United States to argue that "when two or more defendants are tried together, one defendant's misconduct during trial inevitably prejudices the others in the eyes of the jury."[48] But the conduct in Braswell was far more serious than the conduct that occurred in this case.[49] There, one of the defendants assaulted and struck a United States Marshal in the presence of the jury and another defendant arose as if to assist in the assault.[50] On that basis alone, Braswell is distinguishable. Further, the Braswell court *also* considered prejudicial comments made by the Assistant United States Attorney and the Court to conclude that the appellants did not have a fair and impartial trial.[51] Here, White's gesture is the only irregularity at issue, and it was not prejudicial for the reasons already identified.

Perez also argues that White's conduct was prejudicial because "it bolstered the State's theory that the motive for the crime was to prevent [E.C.] from 'snitching.'" He relies on State v. Bourgeois, a case where a spectator made a hand-gesture mimicking a gun pointing at the witness, and the court noted that "[b]ecause fear and retaliation were such central themes in the State's case, the gesture arguably reinforced the impression that the defendant and his friends were the type of people that harm those who testify against them."[52] But

---

[48] Id. at 32 (citing Braswell v. United States, 200 F.2d 597, 602 (5th Cir. 1952)).

[49] See Braswell, 200 F.2d at 600.

[50] Id.

[51] Id. at 600-01.

[52] Bourgeois, 133 Wn.2d at 409.

even in Bourgeois, the court concluded that although the irregularity was fairly serious, it was not so significant that it required a mistrial.[53] Similarly, here, while a comparable argument could be made that White's gesture reinforced the State's theory, it was not so serious as to require a mistrial.

Perez asserts that White's gesture was not cumulative of his own testimony because Perez testified about snitches in general, not about E.C. in particular. But even if this gesture was offered as evidence of a threat against E.C., rather than a general comment agreeing that "snitches end up in ditches," it is nonetheless cumulative. Numerous witnesses testified that E.C. was afraid of the defendants and feared for her life.

Finally, Perez argues that in denying his motion for new trial, the trial court focused on the fact that Perez's attorney did not request a limiting instruction. Perez argues that this failure should not be held against him. But the court identified several reasons when it denied the motion for a new trial, and it did not hinge its analysis on the absence of a proposed limiting instruction, which is just one factor. Moreover, the jurors were instructed to decide the case against each defendant separately. Jurors are presumed to follow the court's instructions, absent evidence proving the contrary.[54]

## EVIDENTIARY RULINGS

Perez alleges two errors based on evidentiary rulings. Neither requires reversal.

---

[53] Id.

[54] State v. Kirkman, 159 Wn.2d 918, 928, 155 P.3d 125 (2007).

*Ski Masks*

Perez argues that the trial court abused its discretion when it admitted evidence of ski masks found at the scene. He argues that this evidence was relevant only for the improper purpose of suggesting that he was "a 'criminal type.'" Assuming, without deciding, that admission was improper, the admission of the ski masks was harmless.

A trial court may admit evidence only if it is relevant.[55] Relevant evidence has any tendency to make a fact of consequence more likely or less likely.[56] The trial court has "wide discretion in balancing the probative value of evidence against its potential prejudicial impact."[57]

ER 404(b) prohibits a court from admitting evidence of other crimes, wrongs, or acts to prove the character of a person in order to show action in conformity therewith. "This prohibition encompasses not only prior bad acts and unpopular behavior but *any* evidence offered to 'show the character of a person to prove the person acted in conformity' with that character at the time of a crime."[58] This rule is "not designed 'to deprive the State of relevant evidence necessary to establish an essential element of its case,' but rather to prevent the

---

[55] Gorman v. Pierce County, 176 Wn. App. 63, 84, 307 P.3d 795 (2013), review denied, 179 Wn.2d 1010 (2014).

[56] Id.

[57] Cole v. Harveyland, LLC, 163 Wn. App. 199, 213, 258 P.3d 70 (2011).

[58] State v. Foxhoven, 161 Wn.2d 168, 175, 163 P.3d 786 (2007).

State from suggesting that a defendant is guilty because he or she is a criminal-type person who would be likely to commit the crime charged."[59]

An appellate court reviews a trial court's evidentiary rulings for abuse of discretion.[60] An appellate court will overturn the trial court's rulings on the admissibility of evidence only if its decision was "manifestly unreasonable, exercised on untenable grounds, or based on untenable reasons."[61] In close cases "'the scale should be tipped in favor of the defendant.'"[62]

When a trial court makes an erroneous evidentiary ruling, the question on appeal "is whether the error was prejudicial, for error without prejudice is not grounds for reversal."[63] "Error will not be considered prejudicial unless it affects, or presumptively affects, the outcome of the trial."[64]

Here, the trial court concluded that evidence of two ski masks, two gun clips, and a gun case were all admissible to show why E.C. was afraid when she was down in the basement and why she did not leave. The court excluded drug and other evidence discovered in other areas of the house.

From our review of the record, the trial court was primarily concerned with the potential for undue prejudice if the gun clips, gun case, and ski masks were

---

[59] Id. (quoting State v. Lough, 125 Wn.2d 847, 859, 889 P.2d 487 (1995)).

[60] Cole, 163 Wn. App. at 213.

[61] Gorman, 176 Wn. App. at 84.

[62] State v. Smith, 106 Wn.2d 772, 776, 725 P.2d 951 (1986) (quoting State v. Bennett, 36 Wn. App. 176, 180, 672 P.2d 772 (1983)).

[63] Brown v. Spokane County Fire Prot. Dist. No. 1, 100 Wn.2d 188, 196, 668 P.2d 571 (1983).

[64] Id.

admitted. They were all found in the basement where the rape and unlawful imprisonment occurred. And the court properly concluded that the evidence could be relevant to these charges for E.C.'s reasonable fear of Perez and White.

Perez essentially contends on appeal that the ski masks are unlike the other items in the group to which he does not object on appeal. In doing so, he implicitly admits that the other items were properly admitted, being both relevant to the crimes charged and not unduly prejudicial.

Accordingly, we need not decide whether admission of the ski masks, by themselves, was an abuse of discretion. Assuming, without deciding that they should have been excluded, the evidentiary ruling was harmless. The other items in the group offered for admission were clearly admissible to show E.C.'s reasonable fear of Perez. Any error in also admitting the ski masks did not affect the outcome of the trial.

### E.C.'s Statement

Perez argues that the trial court abused its discretion when it admitted, as a present sense impression, E.C.'s statement to Deputy Gerald Meyer at the hospital that she was afraid of being killed. Assuming without deciding that admission of this evidence was improper, the ruling is also harmless.

As a threshold matter, the State argues that this claim is not preserved. We disagree. Defense attorneys made a hearsay objection to this testimony on the first day of Deputy Meyer's testimony. The following day, the court heard additional argument and sustained its previous ruling. Deputy Meyer testified on this day immediately following the court's second ruling. Even though there was

no contemporaneous objection on the second day of testimony, we conclude that the hearsay objection was preserved.

The court's interpretation of the rules of evidence is reviewed de novo and its application of the rules to particular facts is reviewed for abuse of discretion.[65]

Under ER 803(a)(1), a statement "describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter" is a "present sense impression" and is not excluded by the hearsay rule. "The statement must be a 'spontaneous or instinctive utterance of thought,' evoked by the occurrence itself, unembellished by premeditation, reflection, or design."[66]

"Evidence that is merely cumulative of overwhelming untainted evidence is harmless."[67]

Here, Deputy Meyer testified that he talked to E.C. in the hospital following the assault and rape, and she told him that she was scared of being killed. But from our review of the record, there does not appear to be an "event" or "condition" that E.C. was perceiving when she made this statement. Accordingly, this statement likely does not qualify as a present sense impression.

But any error in admitting this statement was harmless because Deputy Meyer's testimony was cumulative with testimony of numerous other witnesses. For example, a nurse at Highline Medical Center testified that E.C. was "afraid

---

[65] State v. Sanchez-Guillen, 135 Wn. App. 636, 642, 145 P.3d 406 (2006).

[66] State v. Martinez, 105 Wn. App. 775, 783, 20 P.3d 1062 (2001) (quoting Beck v. Dye, 200 Wash. 1, 9-10, 92 P.2d 1113 (1939)), overruled on other grounds by State v. Rangel-Reyes, 119 Wn. App. 494, 81 P.3d 157 (2003).

[67] State v. Flores, 164 Wn.2d 1, 19, 186 P.3d 1038 (2008).

25

she would get hurt if she gave a lot of information," a pastor testified that E.C. said that "she was afraid that they were going to come back and maybe beat her some more," a social worker testified that E.C. said that "she was worried that the assailants will try and kill her because she was reporting the crime," and a detective testified that E.C. said that "she was afraid to talk to the police" and "was afraid she was going to be killed." This testimony was admitted without objection and is not challenged on appeal.

## RIGHT TO CONFRONT WITNESSES

Perez claims that he "was denied his constitutional right to confront the witnesses against him when a witness testified about Mr. White's out-of-court statement that implicated Mr. Perez."[68] Specifically, he points to Sanders's testimony at trial that on the morning following her fight with E.C., White came upstairs and said, "We f***ed her."[69] Perez contends that his constitutional right to confront his accusers was violated, because he had no opportunity to cross-examine White about this statement. Because he failed to object below and is not entitled to raise this issue for the first time on appeal, we do not reach the substance of this claim.

RAP 2.5(a) sets forth when an issue not preserved below may be raised for the first time on appeal. The proper approach in analyzing alleged constitutional error raised for the first time on appeal involves four steps.[70] First,

---

[68] Appellant's Opening Brief (Amended) at 44.

[69] Id. (quoting Report of Proceedings (Dec. 7, 2011) at 1467).

[70] State v. Lynn, 67 Wn. App. 339, 345, 835 P.2d 251 (1992).

the reviewing court "make[s] a cursory determination as to whether the alleged error in fact suggests a constitutional issue."[71] Second, the court must determine whether the alleged error is manifest.[72] "Essential to this determination is a plausible showing by the defendant that the asserted error had practical and identifiable consequences in the trial of the case."[73] Third, if the error is manifest, the court "must address the merits of the constitutional issue."[74] Fourth, "if the court determines that an error of constitutional import was committed, then, and only then, the court undertakes a harmless error analysis."[75]

The Sixth Amendment confrontation clause provides that in all criminal prosecutions "the accused shall enjoy the right . . . to be confronted with the witnesses against him."[76] "[T]he 'principle evil' at which the clause was directed was the civil-law system's use of ex parte examinations and ex parte affidavits as substitutes for live witnesses in criminal cases."[77] This practice "denies the

---

[71] Id.

[72] Id.

[73] Id.

[74] Id.

[75] Id.

[76] U.S. CONST. amend. VI.

[77] State v. Doerflinger, 170 Wn. App. 650, 655, 285 P.3d 217 (2012) (alteration in original) (quoting State v. Jasper, 158 Wn. App. 518, 526, 245 P.3d 228 (2010), aff'd, 174 Wn.2d 96, 271 P.3d 876 (2012)), review denied, by State v. Clark, 177 Wn.2d 1009 (2013).

defendant the opportunity to test his accuser's assertions 'in the crucible of cross-examination.'"[78]

But not every out-of-court statement used at trial implicates the confrontation clause.[79] The confrontation clause only applies to testimonial statements.[80] A testimonial statement is a "'solemn declaration or affirmation made for the purpose of establishing or proving some fact.'"[81] The United States Supreme Court has listed "three possible formulations for the 'core class' of testimonial statements covered by the confrontation clause:"[82]

> [1] *ex parte* in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially; [2] extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions; [3] statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.[83]

Here, Sanders testified that she, Perez and O'Dell were sitting on the couch, watching TV in the living room when White made the statement to which Perez objects for the first time on appeal. White's testimony was not the

---

[78] Id. (quoting Crawford v. Washington, 541 U.S. 36, 61, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004)).

[79] Id.

[80] Id.

[81] Id. (internal quotation marks omitted) (quoting Jasper, 158 Wn. App. at 526).

[82] Id.

[83] Jasper, 158 Wn. App. at 527 (alterations in original) (citing Crawford, 541 U.S. at 51-52).

equivalent of ex-parte in-court testimony, it was not an extrajudicial statement, and it was not made under circumstances which would lead an objective witness to reasonably believe that the statement would be later used at trial. We conclude, and Perez does not assert otherwise, that White's statement was not testimonial. Thus, the confrontation clause does not apply. Accordingly, Perez fails to establish under RAP 2.5(a) that a constitutional claim is at issue.

Perez relies on Bruton v. United States, for the proposition that "when two or more defendants are tried in a joint proceeding, an out-of-court statement of one which inculpates another may not be admitted in evidence when the maker of the statement does not testify at trial, for the effect would be a denial of the right [to] confrontation."[84] He also cites State v. Vannoy to argue that if a codefendant's confession contains the pronoun "we," and a jury could readily conclude that the "we" includes the defendant, the Bruton rule applies.[85]

While these general rules are true, these cases were decided before Crawford v. Washington and Davis v. Washington, where the Supreme Court clarified the contours of the confrontation clause.[86] As recognized by several

---

[84] Appellant's Opening Brief (Amended) at 44 (citing Bruton v. United States, 391 U.S. 123, 132, 88 S. Ct. 1620, 20 L. Ed. 2d 476 (1968)).

[85] Id. at 46 (citing State v. Vannoy, 25 Wn. App. 464, 472-74, 610 P.2d 380 (1980)).

[86] Crawford v. Washington, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004); Davis v. Washington, 547 U.S. 813, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006).

courts, after <u>Crawford</u>, the Bruton rule similarly applies only to testimonial statements.[87] The First Circuit explained:

> The <u>Bruton/Richardson</u> framework presupposes that the aggrieved co-defendant has a Sixth Amendment right to confront the declarant in the first place. If none of the co-defendants has a constitutional right to confront the declarant, none can complain that his right has been denied. It is thus necessary to view <u>Bruton</u> through the lens of <u>Crawford</u> and <u>Davis</u>. The threshold question in every case is whether the challenged statement is testimonial. If it is not, the Confrontation Clause "has no application."[88]

Thus, because White's statement was nontestimonial, Perez's reliance on <u>Bruton</u> and its progeny is not helpful. Perez fails to show a right to raise this issue anew under RAP 2.5(a).

## CUMULATIVE ERROR DOCTRINE

Perez argues that numerous trial court errors cumulatively denied him a fair trial. We disagree.

The cumulative error doctrine "is limited to instances when there have been several trial errors that standing alone may not be sufficient to justify reversal but when combined may deny a defendant a fair trial."[89]

---

[87] See, e.g., <u>United States v. Smalls</u>, 605 F.3d 765, 768 n.2 (10th Cir. 2010) (stating that "the <u>Bruton</u> rule, like the Confrontation Clause upon which it is premised, does not apply to nontestimonial hearsay statements."); <u>United States v. Johnson</u>, 581 F.3d 320, 326 (6th Cir. 2009), <u>cert. denied</u>, 560 U.S. 966 (2010) (stating that "[b]ecause it is premised on the Confrontation Clause, the <u>Bruton</u> rule, like the Confrontation Clause itself, does not apply to nontestimonial statements"); <u>People v. Arceo</u>, 195 Cal. App. 4th 556, 574-75, 125 Cal. Rptr. 3d 436, <u>cert. denied</u>, 132 S. Ct. 851, 181 L. Ed. 2d 555 (2011) (holding that the <u>Bruton</u> rule does not apply to non-testimonial statements).

[88] <u>United States v. Figueroa-Cartagena</u>, 612 F.3d 69, 85 (1st Cir. 2010) (quoting <u>Whorton v. Bockting</u>, 549 U.S. 406, 420, 127 S. Ct. 1173 (2007)).

[89] <u>State v. Greiff</u>, 141 Wn.2d 910, 929, 10 P.3d 390 (2000).

Here, there is not an accumulation of several errors. Rather, there were at most two evidentiary errors that had no effect on the outcome at trial. The cumulative error doctrine does not warrant reversal.

## CHARGING DOCUMENT

Perez argues that the information was constitutionally deficient because it omitted an essential element of the crime of unlawful imprisonment. Specifically, he asserts that an essential element of the crime is that the restraint was "without legal authority." We disagree.

"[A] charging document is constitutionally adequate only if all essential elements of a crime, statutory and nonstatutory, are included in the document so as to apprise the accused of the charges against him or her and to allow the defendant to prepare a defense."[90] "'An essential element is one whose specification is necessary to establish the very illegality of the behavior charged.'"[91]

The adequacy of a charging document is reviewed de novo.[92]

The controlling case is State v. Johnson.[93] There, the supreme court concluded that the information charging the defendant with unlawful imprisonment was constitutionally sufficient.[94] The information charged Johnson

---

[90] State v. Vangerpen, 125 Wn.2d 782, 787, 888 P.2d 1177 (1995).

[91] State v. Zillyette, 178 Wn.2d 153, 158, 307 P.3d 712 (2013) (internal quotation marks omitted) (quoting State v. Ward, 148 Wn.2d 803, 811, 64 P.3d 640 (2003)).

[92] State v. Johnson, ___ Wn. App. ___, 325 P.3d 135, 137 (2014).

[93] ___ Wn. App. ___, 325 P.3d 135 (2014).

[94] Id. at 137-38.

31

with "Unlawful Imprisonment—Domestic Violence" and alleged that Johnson "did knowingly restrain [J.J.], a human being."[95]

In concluding that the information was not deficient, the supreme court rejected Johnson's argument that the information must include the statutory definition of "restrain."[96] It held that the State did not need to include definitions of elements, and it was enough that the State alleged all of the essential elements found in the unlawful imprisonment statute.[97]

Here, as Perez acknowledges, the information is indistinguishable from that in Johnson.[98] It charged Perez with "Unlawful Imprisonment" and alleged that Perez "did knowingly restrain E.C., a human being." Perez's argument that the information must include that the restraint was "without lawful authority" was expressly rejected in Johnson.[99] Thus, the information is constitutionally sufficient.

## COMMUNITY CUSTODY TERM

Perez argues that the trial court erred when it imposed a three-year term of community custody for the second degree assault conviction. The State concedes that the community custody term should be amended. We accept the State's concession and remand for amendment of the judgment and sentence.

---

[95] Id. (emphasis omitted) (alteration in original).

[96] Id. at 138.

[97] Id.

[98] See Appellant's Supplemental Assignment of Error and Supporting Brief at 4, Johnson, 325 P.3d at 137-38, Clerk's Papers at 66.

[99] Johnson, 325 P.3d at 138.

"A trial court only possesses the power to impose sentences provided by law."[100]

RCW 9.94A.701 provides that a court shall sentence an offender to community custody for three years for a "serious violent offense" and to 18 months for "a violent offense that is not considered a serious violent offense."[101]

Here, the trial court imposed 36 months of community custody for Perez's conviction of assault in the second degree. But, under RCW 9.94A.030(45), assault in the second degree is not a "serious violent offense." Rather, according to RCW 9.94A.030(54)(viii), assault in the second degree is a "violent offense." Thus, the court's imposition of the 36 month term was error.

The proper remedy is to remand to the trial court to either amend the community custody term or resentence on the assault in the second degree conviction consistent with RCW 9.04A.701(2).[102]

## STATEMENT OF ADDITIONAL GROUNDS

Perez makes a number of claims in his statement of additional grounds. None have merit.

### Jury Instructions

Perez first argues that the trial court abused its discretion when "it refused to provide an inferior degree instruction for rape in the third degree."[103] Because

---

[100] In re Pers. Restraint of Carle, 93 Wn.2d 31, 33, 604 P.2d 1293 (1980).

[101] See RCW 9.94A.701(1)(b), (2).

[102] See State v. Boyd 174 Wn.2d 470, 473, 275 P.3d 321 (2012).

[103] Statement of Additional Grounds for Review / RAP 10.10 at 15.

this record shows that there was no affirmative evidence that the intercourse was unforced but nonconsensual, we disagree.

An appellate court reviews de novo a trial court's decision to give an instruction based on a ruling of law.[104] If the trial court's refusal to give a lesser instruction is based on a factual dispute, then it is reviewable for abuse of discretion.[105] A trial court may not submit a theory to the jury for which there is insufficient evidence.[106] When determining if the evidence at trial was sufficient to support the giving of an instruction, an appellate court reviews the evidence in the light most favorable to the instruction's proponent.[107]

Third degree rape is an inferior degree offense to second degree rape.[108] For the trial court to instruct on an inferior degree offense, the evidence must support an inference that only the lesser crime was committed.[109] "It is not sufficient that the jury might simply disbelieve the State's evidence."[110] "'Instead, some evidence must be presented which affirmatively establishes the

---

[104] State v. Brightman, 155 Wn.2d 506, 519, 122 P.3d 150 (2005).

[105] Id.

[106] State v. Munden, 81 Wn. App. 192, 195, 913 P.2d 421 (1996).

[107] State v. Fernandez-Medina, 141 Wn.2d 448, 455-56, 6 P.3d 1150 (2000).

[108] State v. Ieremia, 78 Wn. App. 746, 753, 899 P.2d 16 (1995).

[109] Id. at 754-55.

[110] Id. at 755.

defendant's theory on the lesser included offense before an instruction will be given.'"[111]

To prove second degree rape, the State had to present evidence the sexual intercourse was by forcible compulsion.[112] "Forcible compulsion" means "physical force which overcomes resistance, or a threat, express or implied, that places a person in fear of death or physical injury to herself or himself or another person . . . ."[113] Third degree rape does not require proof of forcible compulsion.[114]

In State v. Charles, the supreme court concluded that the trial court properly refused to instruct the jury on third degree rape.[115] The supreme court reached this conclusion because there was no affirmative evidence that the intercourse was unforced but still nonconsensual.[116]

Here, similarly, there is no affirmative evidence that intercourse was unforced but still nonconsensual.

According to E.C., White said, "If you let us f*** you, then we will not kill you." The men had just assaulted her, and she had previously seen both men with guns. This testimony evidences second degree forcible rape.

---

[111] State v. Charles, 126 Wn.2d 353, 355, 894 P.2d 558 (1995) (quoting State v. Fowler, 114 Wn.2d 59, 67, 785 P.2d 808 (1990)).

[112] See RCW 9A.44.050(1)(a).

[113] RCW 9A.44.010(6).

[114] See RCW 9A.44.060(1).

[115] 126 Wn.2d 353, 356, 894 P.2d 558 (1995).

[116] Id.

According to Perez, he either did not have sexual intercourse with E.C., or he had consensual intercourse with her. This evidence supports an acquittal.

In sum, like <u>Charles</u>, the evidence showed that the sexual contact was by forcible compulsion, was consensual, or did not happen at all. But there is no factual support that that intercourse was unforced but nonconsensual. It is not sufficient that the jury might simply disbelieve the State's evidence. The trial court properly concluded that a third degree rape instruction was not warranted.

Perez makes several arguments to the contrary, but none are persuasive.

First, Perez argues that there was affirmative evidence to support the inferior instruction. Specifically, he argues that "the jury could have found lack of consent without force based on a reasonable inference that [E.C.'s] self-induced cocaine paranoia led her to misperceive threats."[117] To support this argument, he points to E.C.'s testimony where she admitted to smoking crack cocaine and taking oxycodone prior to the incident, admitted that when she consumes crack cocaine her senses are intensified, said she had not slept, and stated after the incident that she thinks O'Dell would never hurt her.

But again, it is not enough that the jury might disbelieve the State's evidence of a threat. Further, this evidence does not support the inferior instruction. The jury was instructed:

> To be a threat, a statement or act must occur in a context or under such circumstances where a reasonable person, *in the position of the speaker,* would foresee that the statement or act would be interpreted as a serious expression of intention to carry out the threat rather than as something said in jest or idle talk.[118]

---

[117] Statement of Additional Grounds for Review / RAP 10.10 at 21.

[118] Clerk's Papers at 149 (emphasis added).

While E.C.'s testimony revealed drug use and sleep deprivation, E.C.'s state of mind is not relevant to the determination of whether a reasonable person, *in the position of the speaker*, would foresee that White's statement would be interpreted as a threat. In sum, this testimony is not affirmative evidence that the sex was "unforced."

Perez argues that "a reasonable person in the position of the speaker, would not 'foresee' that the statement would be interpreted as a serious expression or intention to carry out the threat."[119] We disagree, especially when considering the context in which these statements were made—namely that White and Perez had just violently assaulted E.C.

Perez also argues that E.C. "gave in and said 'well, at least just use a condom.'"[120] Nothing about this testimony shows that the sex was unforced but nonconsensual either.

Next, Perez argues that parties' inconsistent theories of a case do not warrant automatic denial of a request for an inferior degree instruction.[121] But, the trial court did not refuse to provide a rape in the third degree instruction because of the parties' inconsistent theories. Rather, it declined to provide the instruction because there was no affirmative evidence that intercourse was unforced but nonconsensual. This was proper.

---

[119] Statement of Additional Grounds for Review / RAP 10.10 at 22.

[120] Id. at 24 (quoting Report of Proceedings (Dec. 12, 2011) at 1791-93).

[121] Id. at 20.

Perez next argues that <u>Charles</u> is distinguishable based on the fact that physical force was used against the victim.[122] But even if physical force was not used, the rape charge in this case was nonetheless based on forcible compulsion. This factual distinction is irrelevant.

Finally, Perez argues that <u>State v. Fernandez-Medina</u> controls.[123] But in that case, the State presented affirmative evidence from which the jury could find that only the lesser degree offense occurred.[124] Here, in contrast, there was no such evidence. This case does not control.

*Alleged Prosecutorial Misconduct*

Perez argues that the prosecutor committed "flagrant, prejudicial misconduct" that deprived him of his constitutional right to a fair trial.[125] Specifically, he contends that the prosecutor used an improper theme, expressed personal beliefs about witness credibility, emphasized White's courtroom gesture, misstated crucial evidence, and testified about facts not in evidence.[126] We disagree with all of these claims.

Prosecutorial misconduct is grounds for reversal if the prosecutor's conduct was both improper and prejudicial.[127] The court reviews a prosecutor's

---

[122] <u>Id.</u> at 19-20 (citing <u>Charles</u>, 126 Wn.2d at 353).

[123] <u>Id.</u> at 16 (citing <u>State v. Fernandez-Medina</u>, 141 Wn.2d 448, 6 P.3d 1150 (2000)).

[124] <u>Fernandez-Medina</u>, 141 Wn.2d at 462.

[125] Statement of Additional Grounds for Review / RAP 10.10 at 24.

[126] <u>Id.</u> at 24-34.

[127] <u>State v. Monday</u>, 171 Wn.2d 667, 675, 257 P.3d 551 (2011).

conduct in the full trial context, including the evidence presented, the total argument, the issues in the case, the evidence addressed in the argument, and the jury instructions.[128] "Generally the prosecutor's improper comments are prejudicial 'only where there is a substantial likelihood the misconduct affected the jury's verdict.'"[129]

Perez's claims of misconduct fall within three main arguments.

First, Perez argues that the prosecutor's theme in closing was improper because he "bolstered and vouched" for E.C., and he "improperly invited the jury to disbelieve Mr. Perez."[130]

But "[t]he prosecutor has wide latitude in closing argument to draw reasonable inferences from the evidence and to express such inferences to the jury."[131] Further, "counsel may comment on a witness' veracity as long as he does not express it as a personal opinion and does not argue facts beyond the record."[132] Prejudicial error will not be found unless it is "'clear and unmistakable that counsel is not arguing an inference from the evidence, but is expressing a personal opinion.'"[133] "Where a prosecutor shows that other evidence contradicts

---

[128] Id.

[129] Id. (emphasis omitted) (internal quotation marks omitted) (quoting State v. Yates, 161 Wn.2d 714, 774, 168 P.3d 359 (2007)).

[130] Statement of Additional Grounds for Review / RAP 10.10 at 26, 27.

[131] State v. Stenson, 132 Wn.2d 668, 727, 940 P.2d 1239 (1997).

[132] State v. Smith, 104 Wn.2d 497, 510-11, 707 P.2d 1306 (1985).

[133] State v. Sargent, 40 Wn. App. 340, 344, 698 P.2d 598 (1985) (quoting State v. Papadopoulos, 34 Wn. App. 397, 400, 662 P.2d 59 (1983)).

a defendant's testimony, the prosecutor may argue that the defendant is lying."[134]

Here, the prosecutor's statements were not improper. The prosecutor pointed out several factors for the jury to consider when evaluating E.C.'s credibility and this was based on the evidence presented at trial. Further, he did not express a personal opinion. Additionally, Perez testified that he had lied during all of his interviews with the police. Thus, the prosecutor was permitted to argue that Perez was not credible.

Second, Perez argues that the prosecutor repeatedly emphasized, during closing argument, White's in-court gesture and that he urged the jury to find Perez guilty based on this inappropriate conduct. He also argues that the prosecutor "erroneously testified for and on behalf of [E.C.]" regarding this action. But during closing, the prosecutor made it clear that this action was made only by White. Further, Perez does not cite any authority to evaluate these arguments. Accordingly, we do not address them any further.

Third, Perez argues that the prosecutor committed misconduct by misstating crucial evidence. He argues that the prosecutor misstated the evidence in three instances: (1) when the prosecutor argued that White and Perez were "tag teaming" the victim back and forth; (2) when the prosecutor declared that both White and Perez threatened to punch E.C. in the face; and (3) when the prosecutor declared that White and Perez told E.C. they would not kill her if they "let [them] f*** [her] in the ass," because only White made this statement.

---

[134] State v. McKenzie, 157 Wn.2d 44, 59, 134 P.3d 221 (2006).

But examination of the record indicates that the prosecutor did not misstate the evidence.

E.C. testified that "[White] started having sex with [her] . . . and then [Perez] did. And they kept trying to switch back and forth." Based on this testimony, it was not improper to describe this as "tag teaming."

Next, while it is true that it was White who threatened to punch E.C. in the face, the prosecutor's argument focused on the fact that Perez and White were working together, and he was speaking generally about the events that transpired. His comments were not improper.

Additionally, Perez is correct that White was the one who stated: "If you let us f*** you, then we will not kill you." But Perez was present and was ready to participate, as evidenced by his conduct that followed. It was not improper to attribute this threat to both White and Perez.

Finally, Perez argues that the misconduct had a cumulative effect of depriving him of a fair trial. Because there was no misconduct, we reject this argument.

### Ineffective Assistance of Counsel

Perez also argues that his counsel's failure to object to the prosecutorial misconduct "amounted to deficient performance which prejudiced [him]." Because there was no misconduct and no deficient performance, we disagree.

*Sufficiency of the Evidence*

Perez argues that the evidence was insufficient to sustain his convictions of two counts of rape in the second degree and one count of unlawful imprisonment. This argument is wholly unpersuasive.

Evidence is sufficient when any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt.[135] All reasonable inferences must be drawn in favor of the State and against the defendant.[136] An appellate court considering a sufficiency challenge must defer to the jury's determination as to the weight and credibility of the evidence and to the jury's resolution of any conflicts in the testimony.[137]

A person may commit rape in the second degree by engaging in sexual intercourse with another person by forcible compulsion.[138] Additionally, accomplices are legally accountable for one another's actions.[139]

Here, there is ample evidence to prove that Perez and White raped E.C. by forcible compulsion. E.C. testified that Perez and White both punched her in the face, that White said, "If you let us f*** you, then we will not kill you." She testified that she thought they would kill her if she did not have sex with them and that she had seen them both with guns. Further, she described how both White

---

[135] State v. Green, 94 Wn.2d 216, 221, 616 P.2d 628 (1980).

[136] State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992).

[137] State v. Thomas, 150 Wn.2d 821, 874-75, 83 P.3d 970 (2004).

[138] RCW 9A.44.050(1)(a).

[139] RCW 9A.08.020(1), (2)(c).

and Perez took turns raping her and testified that both men put their penises in her anus and touched their penises to her face.

There is also sufficient evidence to support Perez's conviction for unlawful imprisonment. A person commits unlawful imprisonment by knowingly restraining another person.[140] "Restrain" means "to restrict a person's movements without consent and without legal authority in a manner which interferes substantially with his or her liberty."[141] Restraint can be "without consent" if it is accomplished by physical force, intimidation, or deception.[142]

Here, E.C. testified that Perez and White wouldn't let her leave the room. She said that White made her sleep on the inside of the couch while he slept on the other side, and that any time she got up to use the bathroom, they would walk her to the bathroom. She testified that White and Perez told her she could not leave. She said that in the days after the rape, she felt like she could not leave the house because they would kill her.

In sum, there is sufficient evidence to sustain Perez's convictions.

Perez also argues that reversal should be granted because the cumulative effect of the errors raised. We again reject this claim.

---

[140] RCW 9A.40.040(1).

[141] RCW 9A.40.010(6).

[142] RCW 9A.40.010(6)(a).

43

We affirm except for the community custody term, which we vacate. We remand for the trial court to amend the community custody term or resentence on the conviction for count I, second degree assault.

_Cox, J._

WE CONCUR:

_Schindler, J._          _Becker, J._